IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **Carol Dawn Rorig**, | : | Case No. 1:05cv801 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART |
| | : | AND DENYING IN PART |
| **Howard G. Thiemann, et al.,** | : | MOTION TO DISMISS, GRANTING |
| | : | MOTION FOR SUMMARY |
| Defendants. | : | JUDGMENT, AND DENYING |
| | | MOTION TO STRIKE OF |
| | | DEFENDANT TURMAN |

This matter comes before the Court on the Motion to Dismiss of Defendant Stephen M. Turman (doc. 15), Plaintiff's Response in Opposition (doc. 18), and Defendant's Reply in Support (doc. 23); the Motion for Summary Judgment of Stephen M. Turman (doc. 44), Plaintiff's Response in Opposition (doc. 48), and Defendant's Reply in Support (doc. 57); and Defendant Stephen M. Turman's Motion to Strike (doc. 59), Plaintiff's Memorandum in Opposition (doc. 62), and Defendant's Reply in Support (doc. 66). For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion to Dismiss, **GRANTS** Defendant's Motion for Summary Judgment on the remaining claims, and **DENIES** Defendant's Motion to Strike.

## I.     BACKGROUND

This action arises from the sale of two apartment buildings, collectively containing sixty-three units, located in Hamilton County, Ohio (hereafter "Real Estate"). Plaintiff Carol Rorig, a California resident, purchased the Real Estate for $1,105,000 in March 2005. Rorig learned of

the Real Estate through her fiancé, Anthony Simmons, who used a commercial real estate website, Loopnet, to search for potential investment property.  Simmons was knowledgeable about real estate ownership and sales.  Through Loopnet, Simmons contacted realtor Stephen M. Turman, who markets and sells real estate under the trade name Investment Property Advisors, or IPA.[1]

Turman had listed the Real Estate for sale in the fall of 2004.  In connection with his marketing of the Real Estate, Turman produced an investment brochure (hereafter "Investment Brochure").  (*See* doc. 65, proposed amended complaint, Ex. B.)[2]  The Investment Brochure included a property summary, a property description, photographs of the Real Estate, a 2004/2005 proforma showing estimated income and expenses, and a rent roll.  (*See* doc. 65 Ex. B.)  Turman obtained information for the Investment Brochure from Thiemann Realtors, Inc., a realty and property management company partially owned by Steven Thiemann, and Vertis Dye, the Real Estate's property manager.  (Turman Dep. 266-69.)  Steve Thiemann manages all of the apartment buildings for Thiemann Realtors and is the son of Howard Thiemann, one of the six sellers of the Real Estate.[3]  (Thiemann Dep. 33.)  The Investment Brochure included the following, full-page disclaimer:

---

[1] Turman and IPA, both defendants in this action, are hereafter collectively referred to as "Turman."

[2] Rorig manually filed a copy of the Investment Brochure with her original complaint in December 2005, thus the Brochure is not available electronically as part of doc. 1.  However, Rorig electronically filed a copy of the same Brochure in conjunction with filing her motion for leave to file an amended complaint, doc. 65, and the Court will direct the reader to that document when referring to the Investment Brochure.

[3] Howard Thiemann and the other five former owners of the Real Estate are also named as defendants in this action, as are Vertis Dye and Thiemann Realtors.

> This investment brochure has been prepared solely for informational purposes (and not as an offer) to assist the potential purchaser in determining whether he wishes to proceed with an in-depth investigation of the property.  No representations or warranties, express or implied, as to the accuracy or completeness of this investment brochure or any of its contents shall be deemed made, and no legal commitment or obligation shall arise by reason of this investment brochure or its contents.  Interested parties are expected to review independently all documents relating to the property as to the accuracy and completeness of the information contained herein.  All financial projections have been based upon various assumptions relating to the general economy, competition and other factors beyond Investment Property Advisors reasonable control and therefore, are subject to material variation.
>
> Investment Property Advisors, its prospective officers, employees or representatives do not make any representation or warranty, express or implied, as to the accuracy or completeness of this brochure or any of its contents.

(Doc. 65 Ex. B.)  The 2004/2005 proforma included in the Investment Brochure indicated that the Real Estate had a ninety-four percent occupancy rate and an effective annual income of $265,280.  (*Id.*)  The proforma contained the following statement: "The statements and figures herein, while not guaranteed, are secured from sources we believe reliable."  (*Id.*)  Turman provided the Investment Brochure to Simmons, who then showed it to Rorig.  Both Rorig and Simmons read and understood the disclaimer.  (Turman's Proposed Undisputed Facts, doc. 44 ¶8; Rorig's Response, doc. 48-2 ¶8.)

Turman eventually became a dual agent, representing both the sellers and the buyer of the Real Estate.  On February 15, 2006, Rorig entered into two purchase contracts (hereafter "Purchase Contracts") with the sellers for the Real Estate in the total amount of $1,105,000.

Thereafter, Simmons performed due diligence on the property.[4]  Simmons inspected the property and talked to tenants as part of his inspection.  At Simmons' request, Turman provided Simmons with additional information, which he obtained from Thiemann Realtors, including 2002 and 2003 Form 8825 tax forms (doc. 65 Ex. F), the current tax bill, a legal description, a January "Rent Roll" (Turman Dep. Ex. 25), a January "Rent Roll & Recurring Charges" form (*id*. Ex. 26), and a copy of all the leases (*id*. Ex. 47).  In addition, Turman created and provided to Simmons a summary document "that matched up the names and the rents and then whether or not the tenant had a lease or not," which he created by cross-referencing the January Rent Roll and the leases.  (*Id*. Ex. 35; Turman Dep. 272; *see also* Turman Dep. 344-45, 351-52.)

The January 2005 Rent Roll & Recurring Charges form listed the tenants' names, the unit number, the number of bedrooms in the unit, the rent charge (abbreviated as RC), and a "total" for each unit.  (Doc. 65 Ex. D.)  The third and last page of the Rent Roll and Recurring Charges form was a summary that stated a monthly "Total Income/Receipts" for fifty-eight customers[5] of $20,305.  Around the same time, Turman also provided Simmons with Rent Roll & Recurring Charges forms for February and March.  (*Id*.)  Like the January form, the February Rent Roll & Recurring Charges form listed a Total Income/Receipts of $20,310 for fifty-eight customers. (*Id*.)  The March Rent Roll & Recurring Charges form listed a Total Income/Receipts of $20,660

---

[4]  In her deposition, Rorig explained that Simmons "was the one that performed the due diligence, . . . that was his role within this."  (Rorig Dep. 223.)  Rorig also testified that she relied on Simmons' judgment as to what information he should ask for as part of the due diligence required:  "Q.  So, you relied upon Mr. Simmons' judgment in determining whether or not he should ask for and provide you the appropriate information including operating statements before you entered into this transaction; isn't that correct?  A.  Yes."  (Rorig Dep. 223.)

[5]  Because there are sixty-three units and only fifty-eight customers, the form reflected five vacancies.

for fifty-nine customers.  The 2002 tax form Turman provided to Simmons reflected total gross annual rents from the Real Estate of $204,189.  (Doc. 65 Ex. F).  The 2003 tax form reflected total gross annual rents of $191,578.  (*Id*.)  Simmons and the lender asked for clarification due to the apparent discrepancy between the 2005 rent rolls and the 2002/2003 tax forms.[6]  Based on this request, Turman called Steve Thiemann and asked that he provide clarification.  In response, Thiemann Realtors sent Simmons and Rorig a letter dated March 8, 2006, that stated:

> To Whom it May Concern:
>
> The current rental income numbers are higher than those in 2002 and 2003 in large part due to the higher number of vacancies at that time (2002 and 2003).  However, currently we have a much more positive occupancy rating due, in part, to a better rental market and the redevelopment of some other apartment land, which brought those tenants to us and other investors in the area.

(Doc. 65 Ex. G.)

On February 15, 2005, Rorig signed the Purchase Contracts for the Real Estate.  The Contracts state:

> 5. CONTINGENCIES: The Buyer's obligation to close this transaction is continent upon the following:
>
> \*        \*        \*
>
> (b) INSPECTIONS: This Purchase and Sale Agreement and the consummation of this transaction are contingent upon the Buyer making a determination of the feasability of the subject property for his intended purpose.  In making that determination, Buyer shall undertake certain investigations and examinations of the property.  Buyer shall have n/a days from a mutually executed contract to make any investigations and examinations which he

---

[6]  According to Turman, the lender wanted to know "why 2002/2003 income numbers were different than what the property was doing in '04. . . .  the rent rolls that I had received in '04 extrapolating those out to an annual number were much higher than the income they reported in their '02 and '03 tax returns."  (Turman Dep. 422-23.)

> feels are appropriate.  Buyers examinations and investigations
> shall include, but not be limited to, the following:
>           *       *       *
>      2.  Review all operating statements for the last two years
> and the current year-to-date, which statements shall reflect
> operating costs, rent schedules and collected income.
>           *       *       *
> 7.  BUYER'S EXAMINATION.  Buyer is relying solely upon
> Buyer's own examination of the Real Estate and inspections herein
> required, if any, for its physical condition and character, and the
> real estate's suitability for Buyer's intended use thereof and not
> upon any representations by the REALTORS® involved, except
> for those made by said agents directly to the Buyer in writing.

(Doc. 65 Ex. C.)  Rorig understood that, prior to signing the Agreements, she was entitled to

review operating statements for the prior two years, but she did not ask for them.  (Rorig Dep.

222.)  Simmons was familiar with Rent Manager, a computer program used by property

management companies, including Thiemann.  (Simmons Dep. 677.)  He was aware that Rent

Manager can generate actual deposit records and payment histories for each tenant, but he did

not request it either.  (*Id*. 678-79.)

      Simmons hired Don Smith as the first property manager under Rorig's ownership, and in

the middle of March 2005, Smith put fliers under the tenants' doors notifying them of new

management beginning April 1.  (Smith Dep. 11.)  April rent was due on the first of the month,

but by April 7th-8th, Smith had received rent from less than ten percent of the tenants.  (Smith

Dep. 17.)  He then went door-to-door to collect the rent, and the rent began "trickling in."  (*Id*. at

18).  None of the tenants told Smith that they had never paid rent or that they weren't expected to

pay rent.  (*Id*. at 19, 29.)  However, Smith discovered that "the rents were paid haphazardly.

They [the tenants] were used to paying $100 here, $100 there."  (*Id*. at 112.)  Seventeen tenants

were eventually evicted for failure to pay April rent.  (*Id*. at 25.)

Out of this scenario springs Rorig's nine-count complaint making the following claims against all defendants: (1) fraud, (2) breach of contract based on fraud in the inducement, (3) breach of contract–implied conditions, (4) unjust enrichment, (5) breach of implied duty of good faith and fair dealing, (6) Racketeer Influenced and Corrupt Organizations Act claim based on wire fraud, (7) conversion, (8) constructive trust, and (9) punitive damages/attorney fees. (Doc. 1.)  Rorig asserts that, because "approximately 50% of the Tenants were not paying rent means that Rorig paid at least twice the fair market value of the Real Estate."  (Doc. 1 ¶ 54.)  Although she sought rescission as a remedy at the time she filed the Complaint, Rorig no longer owns the Real Estate because the lender sold it at a foreclosure sale.

Turman moves to dismiss the claims against him under Fed. R. Civ. P. 9(b) and 12(b)(6), asserting that Rorig's Complaint fails to state a claim against him upon which relief can be granted, and the Complaint fails to allege with sufficient particularity any facts connecting Turman to the alleged scheme underlying the claims for fraud and for violation of the federal RICO statutes.  (Doc. 15.)  Turman also moves for summary judgment in his favor on all of Rorig's claims.

## II.    LEGAL STANDARD

### A.    Motion to Dismiss

Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss, a court "must read all well-pleaded allegations of the complaint as true."  *Weiner v. Klais and Co.*, *Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996)).  In addition, a court must construe all allegations in the light most favorable to the

7

plaintiff. *Bower*, 96 F.3d at 203 (citing *Sinay v. Lamson & Sessions*, 948 F.2d 1037, 1039 (6th Cir. 1991)).

The Supreme Court has recently explained "an accepted pleading standard" that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, --- U.S.----, 127 S. Ct. 1955, 1969 (2007). To withstand the dismissal motion, the complaint "does not need detailed factual allegations," but it must contain "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Twombly*, 127 S. Ct. at 1964-65. The complaint "must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Weiner*, 108 F.3d at 88 (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993)). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 127 S. Ct. at 1965. The Court does not require "heightened fact pleading of specifics, but only enough to state a claim for relief that is plausible on its face." *Twombly*, 127 S. Ct. at 1974.[7]

Additionally, Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). "[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d

---

[7] The *Twombly* Court made it plain that courts should no longer use the language of *Conley v. Gibson*, 355 U.S. 41 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that which would entitle him to relief," when evaluating whether a complaint can withstand a dismissal motion. *Twombly*, 127 S. Ct. at 1968 (quoting *Conley*, 355 U.S. at 45-46).

776, 783 n.5 (4th Cir. 1999); *see also Mich. ex rel. Kelley v. McDonald Dairy Co.*, 905 F. Supp. 447, 450 (W.D. Mich. 1995).

The Sixth Circuit reads Rule 9(b)'s requirement "liberally, ... requiring a plaintiff, at a minimum, to allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Advocacy Organization for Patients and Providers v. Auto Club Ins. Ass'n*, 176 F.3d 315, 322 (6th Cir. 1999) (citing *Coffey v. Foamex L.P.*, 2 F.3d 157, 161-62 (6th Cir.1993)). "Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006), *cert. denied* 127 S. Ct. 303 (2006) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 679 (6th Cir. 1988)). "On the other hand, a district court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions." *Id.* (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)).

### B.     Motion for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the

9

lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

## III.   ANALYSIS

### A.  Fraud

Turman argues that Rorig's fraud claim against him must be dismissed under Rule 9 because the Complaint does not state the claim with the requisite particularity as to Turman and because Rorig cannot prove that Turman made any representation to her. Specifically, Turman argues that the Complaint is not sufficiently particular because Count One of the Complaint refers to the representations and intent of "Defendants," not Turman specifically. Turman also argues that the disclaimer language contained in the Investment Brochure and the Buyer's Examination statement within the Purchase Contracts preclude Rorig from establishing that she reasonably relied on any representations made by Turman.

The Court disagrees with Turman's argument that the Complaint fails to allege specific facts as to Rorig's allegedly fraudulent acts. To prove a claim for common law fraud under Ohio law, a plaintiff must prove:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 352 (6th Cir. 2000) (citing *Burr v. Board of County Comm'rs of Stark Co.*, 23 Ohio St. 3d 69, 491 N.E.2d 1101, 1105 (1986)). Rorig has alleged that Turman made specific false representations concerning the Real Estate's occupancy and annual income in the Investment Brochure that he sent to her prior to her execution of the Purchase Contracts (doc. 1 ¶¶ 17-18), that the Real Estate's occupancy rate and effective annual income were material to the transaction (*id*. at ¶ 41), that Turman was aware that the occupancy and income stated in the Brochure was artificially inflated due to stacking (*id*. at ¶ 20), that the Investment Brochure was submitted to her with the intent of misleading her to rely upon the misrepresented occupancy rate and effective annual income of the Real Estate (*id*. at ¶ 43), that she justifiably relied upon the misrepresented occupancy rate and income (*id*. at ¶ 44), and that she was injured by paying $1,105,000 for the Real Estate (*id*. at ¶ 45). The Complaint therefore satisfies Rule 9(b)'s requirement that she "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Advocacy Organization for Patients and Providers*, 176 F.3d at 322.

As to Turman's second argument, that the disclaimer language in the Investment Brochure and the Purchase Contracts forecloses her from being able to prove the reliance element of fraud, it is true that "[w]here the plaintiff's cause of action arises out of a contract

11

which has been attached to the complaint as an exhibit, and where such contract shows unambiguously on its face that the relief prayed for is not merited, dismissal is both justified and appropriate," *Goodman v. Bd. of Trustees of Cmty Coll. Dist. 524*, 498 F. Supp. 1329, 1337 (D.C. Ill. 1980). However, dismissal of Rorig's fraud claims on this basis is inappropriate. The Buyer's Examination language of the Purchase Contracts provides that the buyer is not relying upon any representations by the realtor involved "except for those [representations] made by said agents directly to the Buyer in writing." (Doc. 65 Ex. C.) Rorig alleged that Turman made representations about the Real Estate directly to her in writing by means of the Investment Brochure. Construing all allegations in a light most favorable to Rorig, she has sufficiently alleged that Turman made representations directly to her, and the Purchase Contract language does not unambiguously show that the relief prayed for is not merited.

Additionally, the single factor that the Investment Brochure contained a disclaimer cannot militate a dismissal of Rorig's fraud claim: "Reliance is justified if the representation does not appear unreasonable on its face and if, *under the circumstances*, there is no apparent reason to doubt the veracity of the representation." *Abbott v. Loss Realty Group*, 2005 WL 2933757 at *4, 2005-Ohio-5876 (Ohio App. 2005) (finding that home purchasers' reliance on the accuracy of a property "feature sheet" was unjustified when the feature sheet contained a disclaimer *and* the record showed that the purchasers were aware before closing of discrepancies between the feature sheet and the property's actual features due to their own personal inspection of the property and tax records) (quoting *Crown Prop. Dev., Inc. v. Omega Oil Co.*, 113 Ohio App. 3d 647, 656, 681 N.E.2d 1343 (1996)).

12

Unfortunately for Rorig, while the claim of fraud against Turman survives his motion to dismiss, it cannot withstand his motion for summary judgment. Rorig has failed to present affirmative evidence with respect to at least two elements of the claim. Specifically, she has failed to demonstrate that there exists a triable issue that (1) Turman knowingly or recklessly made false representations to her concerning the Real Estate or that (2) she justifiably relied upon any representations made by Turman. With respect to information contained in the Investment Brochure, there is no evidence whatsoever that Turman knowingly or recklessly made false representations therein. Turman obtained all the information in the Brochure from Thiemann Realtors and Vertis Dye; he did not generate the information himself. Thus, even if information contained therein was false, Rorig has not shown that there is a triable issue of fact as to whether Turman acted in knowing or reckless disregard of the truth.[8] Because Rorig has failed to demonstrate a triable issue as to her assertion that Turman knowingly or recklessly provided her with false information, Turman also is protected by Ohio Rev. Code § 4735.68, which provides that "[a] licensee is not liable to any party for false information that the licensee's client provided to the licensee and that the licensee in turn provided to another party in the real estate transaction, unless the licensee had actual knowledge that the information was false or acted with reckless disregard for the truth."

The facts also demonstrate that Rorig did not reasonably rely on the information contained in the Investment Brochure, at least to the extent she thought it was indicative of

---

[8] Rorig points out that Turman never checked with Albert Zimmer, who kept the books for the Real Estate, about the rental income of the property. (Zimmer Dep. 136; Turman Dep. 188-91.) If anything, this bolsters the fact that Turman had no reason to believe that the effective annual income contained in the Investment Brochure was not accurate.

actual income generated by the property. While it is true that the proforma reflected an effective annual income of $265,280, the proforma expressly indicates that the income listed therein is "ESTIMATED" and is based on an "Estimated Vacancy" of six percent. (Doc. 65 Ex. B p. 9.) Furthermore, a proforma by definition represents figures based on financial assumptions or projections. In combination with the express disclaimers, the additional facts that Rorig had the opportunity to ask for operating statements but did not, that she delegated the task of due diligence to Simmons, and that the due diligence revealed information that arguably contradicted information contained in the Brochure demonstrate that Rorig was not justified in relying on the information in the Investment Brochure for actual income generated by the Real Estate.

Neither has Rorig demonstrated that there is a triable issue of fact that Turman acted fraudulently between the time she signed the Purchase Contracts and the time she closed on the Real Estate. Again, with the exception of the summary document "that matched up the names and the rents and then whether or not the tenant had a lease or not," (Turman Dep. Ex. 35), Turman did not prepare any of the information he provided to Simmons. As the summary was merely a melding of information provided by Thieman Realtors, and because Rorig has presented no facts to demonstrate that Turman knew or had reason to know of any falsity in those documents, Turman's production of the summary and the underlying documents cannot form the basis of a claim of fraud against him.

The crux of Rorig's allegations against Turman is the concept that Turman "knew the rent rolls did not contain the necessary information for evaluating the rental income derived from the Property and failed to disclose that fact to his client, Rorig." (Doc. 48 at 7.) This allegation, even if true, cannot form the basis of a fraud claim against Turman. The information contained

14

in the rent rolls was not demonstrably false, and Rorig does not so allege.  Rather, her argument

is that the rent rolls "had no correlation to whether a listed tenant ever paid rent."  (Doc. 48 at 7.)

That Rorig failed to understand the information contained within the rent rolls does not make

them false.[9]

Additionally, to the extent Rorig relied on the rent rolls as demonstrating actual rental

income, she was not justified in so doing.  She was aware that the prior two years' tax returns

indicated that the Real Estate was reporting a loss; she was aware that she was entitled to ask for

operating statements and chose not to do so; and she could have requested information pertaining

to rent delinquencies but did not do so.  Notwithstanding the fact that she delegated the task of

performing due diligence to her fiancé, it was Rorig herself who entered into the Purchase

Contracts, which expressly provides that the "Buyers examinations and investigations shall

include, but not be limited to, the following: . . . 2.  Review all operating statements for the last

two years and the current year-to-date, which statements shall reflect operating costs, rent

schedules and collected income."  There is no evidence in the record that Rorig, or Simmons,

ever asked Turman for information pertaining to "collected income," much less that he provided

false information pertaining to the same.

---

[9] Rorig cites *Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167 (Ohio 1984) for its affirmation of
the trial court's finding that a defendant's overstatement of rental income produced by rental
property was evidence of fraud.  The facts of *Cohen* are distinguishable.  In *Cohen*, the trial court
concluded that the defendant made false and fraudulent representations in the following respects:
(1) he falsely represented that there were no building orders against the property, (2) he falsely
represented the percentage of the number of rented apartments; and (3) he falsely represented all
that the building needed was ordinary maintenance.  *Coehn v. Lamko, Inc.*, No. CA 7974, 1983
WL 4907, *2 (Ohio App. July 6, 1983).  As discussed above, there is no evidence that Turman
falsely represented the number of rented apartments or anything else.  Furthermore, there is no
evidence in this case that Simmons or Rorig ever requested a list comprising amounts of rent
actually paid, so there is no evidence that Turman ever provided a false list.

Nor can knowledge of any falsity contained within the Affirmation Letter from Thiemann Realtors be imputed to Turman. Again, Ohio Rev. Code § 4735.68 provides that "[a] licensee is not liable to any party for false information that the licensee's client provided to the licensee and that the licensee in turn provided to another party in the real estate transaction, unless the licensee had actual knowledge that the information was false or acted with reckless disregard for the truth." There is no evidence that Turman had actual knowledge that anything conveyed in the letter was false nor that he acted with reckless disregard for the truth of the information. The letter states: "The current rental income numbers are higher than those in 2002 and 2003 in large part due to the higher number of vacancies at that time (2002 and 2003)." (Doc. 65 Ex. G.) According to Simmons, he asked Turman about the accuracy of the letter and "Turman told me the information in the Affirmation Letter was accurate and at no time informed me that the rent rolls were not reliable for determining the actual rental income from the Property." (Doc. 48-11 ¶ 9.)[10] It is not inconsistent for Turman to state, and believe, that (1) the letter was accurate and (2) for him to never inform Simmons that the rent rolls were not reliable for determining actual rental income. The letter makes no reference to rent rolls, and Simmons' affidavit does not indicate that he asked Turman if the rent rolls reflected actual rental income. Indeed, Rorig has pointed to no evidence in the record to show that Turman knew what the rental income was in March 2005. Turman knew what Simmons and Rorig knew from the rent rolls and other

---

[10] Simmons submitted his affidavit in support of Rorig's memorandum in opposition to Turman's motion for summary judgment. Turman moved to strike the affidavit on grounds that it contradicted Simmons' earlier deposition testimony. The Court concludes that the paragraphs 9 and 10 of the affidavit do not directly contradict the statements Simmons made in his deposition and, therefore, deny Turman's motion to strike (doc. 59). *See, e.g., Phillips v. Tradesmen Intern., Inc.*, No. 1:05CV485, 2006 WL 2849779, *7(S.D.Ohio, Sept. 29, 2006) (discussing guidelines for the exclusion of directly contradictory testimony).

information obtained from Thiemann Realtors: the number of vacancies and the rent charged for each unit.

Rorig also alleged in her Complaint that the property manager of the Real Estate had placed non-paying tenants into the rental units for the purpose of artificially inflating the occupancy rating of the Real Estate in anticipation of a potential sale, a practice referred to as "stacking," and that Turman was aware of the stacking. However, she has presented no evidence of such in her opposition to Turman's motion for summary judgment. (*See* Rorig Dep. 151, 170, 171.)[11]  In fact, Don Smith, the property manager, testified that he never told Simmons that the property had been "stacked" and that no tenant ever told him the prior owners said he/she could live there rent-free. (Smith Dep. 34, 19.)  In sum, Rorig has failed to demonstrate any specific facts showing there is a genuine issue for trial as to her allegations of fraud against Turman. Accordingly, summary judgment in Turman and IPA's favor is appropriate on that claim.

### B.  Breach of Contract Based on Fraud

In Count Two of her Complaint, Rorig alleges that her "consent to enter into the Purchase Contracts was seduced by the lies and deliberate half-truths made and published by the Defendants" and that she is therefore "entitled to rescind the Purchase Contracts entered into with the Sellers." (Doc. 1 ¶ 48.)  Turman argues that Rorig cannot state a claim against him for breach of the Purchase Contracts because he was not a party to the Contracts.  The Court agrees.

"Where there has been a breach of a material and vital provision of a contract by one party, the other party thereto may either treat the contract as terminated and rescind it and pursue

---

[11]  Rorig's denial of Turman's proposed undisputed fact to this effect has no merit, as her citations to Turman's deposition transcript and exhibits in support of her denial do not relate to or demonstrate evidence of stacking.  (Doc. 48-2 ¶ 45.)

the remedy that such rescission entitles him to, or he may sue for damages for a breach of the contract." *Wilson v. Kreusch*, 111 Ohio App. 3d 47, 56, 675 N.E.2d 571, 576 (Ohio App. 1996) (*quoting* 18 Ohio Jurisprudence 3d (1980) 230, Contracts, Section 309). Therefore, the law does not support a claim for rescission of a contract as against one who is not a party to the contract.

Turman, the real estate agent, was not a party to the Purchase Contracts that Rorig seeks to rescind. He was not a signatory to the Contracts and had no rights to enforce the Contracts against either party. At most, he was a third-party beneficiary of the Contracts based on his entitlement to a commission at the Contracts' closing. Rorig's argument that a fraudulent misrepresentation by a selling broker subjects one to liability for breach of contract based on fraud is unsupported by case law. (*See* doc. 18 at 7.)[12] Thus, Rorig has failed to state a breach of contract claim against Turman, and Count Two against him and IPA is hereby dismissed.

### C. Breach of Contract–Implied Condition

Rorig's third count asserts that she is entitled to her "loss of the bargain" that she expected when she entered into the Purchase Contracts. As stated above, Turman was not a party to the Purchase Contracts and, accordingly, Rorig has failed to state a breach of contract claim against him. Count Three of the Complaint is dismissed as to Turman and IPA.

### D. Unjust Enrichment

---

[12] Rorig cites *Buchanan v. Geneva Chervenic Realty*, 115 Ohio App. 3d 250, 685 N.E.2d 265 (Ohio App. 1996) as support for her assertion that "a realty company and its agents that engage in fraud to culminate a sale are liable to the defrauded party whether they made the representations knowing they were false, or with reckless disregard for the truth thereof." While this assertion is true, an agent's liability in such a situation is based in fraud, not on breach of the purchase contract. The Court is unable to find any Ohio authority that holds that a real estate agent who procured a transaction can be held liable for restitutionary damages to purchasers although the agent was not himself a party to the contract.

Turman argues that Rorig cannot state a claim against him for unjust enrichment because under Ohio law, "an equitable action in quasi-contract for unjust enrichment will not lie when the subject matter of that claim is covered by an express contract or a contract implied in fact." *Ryan v. Rival Mfg. Co.*, 1981 WL 10160, *1, 1st Dist. No. C-810032, (Ohio App. Dec. 16, 1981).

While it is true that "Ohio permits no recovery on such theories [as unjust enrichment] where . . . an 'express contract cover(s) the same subject' . . .," *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir. 1975), a claim for unjust enrichment only is barred "when a plaintiff seeks a remedy *under the terms of the* contract and when *the subject matter of the dispute is governed by the contract*." *Zangara v. Travelers Indemnity Co. of America*, 423 F. Supp. 2d 762, 775 (N.D. Ohio 2006), *overruled on jurisdictional grounds* (finding that the plaintiff's claim for unjust enrichment was not barred by the existence of an insurance policy between the parties because the plaintiff's fraud claim was not dependent on any interpretation of any provision or section of the insurance policy, and rights granted in the policy, or any subject matter governed by the policy). Turman is not a party to the Purchase Contracts, and Rorig's fraud claim is not dependent on any interpretation of the Contracts.  Therefore, Turman cannot rely on the Contracts to defeat Rorig's claim of unjust enrichment.

However, Rorig's claim of unjust enrichment fails on its merits.[13]  In response to Turman's motion for summary judgment on the unjust enrichment claim, Rorig asserts that "the

_____

[13]  Three elements comprise an unjust enrichment claim: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Hambelton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 183, 465 N.E.2d 1298 (1984).

crux of [her] claims against the Defendants is that they perpetrated a fraud upon her through misrepresentations overstating the amount of rental income produced by the property" and that delinquency reports from January, February, and Marcy of 2006 reflect that rent was not being paid. (Doc. 48 at 16-17.) As stated above, Rorig has presented no evidence that Turman knowingly or recklessly provided her with false information as to the amount of rental income produced by the property. There is no evidence that Turman ever saw or knew about the delinquency reports, and Rorig admitted that she had no reason to believe any information in the Investment Brochure was inaccurate at the time it was prepared or at the time she saw it. (Rorig Dep. 69, 215-17.) Because Rorig's unjust enrichment claim against Turman depends on her allegations of fraud, her unjust enrichment claim against him must fail.

### E. Breach of Implied Duty of Good Faith and Fair Dealing

Rorig's fifth count asserts that "[u]nder Ohio law, every contract burdens the parties with the obligation to act and deal with one another in good faith" and that "[b]y knowingly misrepresenting that the Tenants were paying rent and were doing so on a consistent and timely basis, the Defendants have breached their duty of good faith, entitling Rorig to rescind the Purchase Contracts. . . ." (Doc. 1 ¶¶ 59-60.) Turman asserts that Rorig has failed to state a claim against him for breach of implied duty of good faith and fair dealing because not every contract automatically is subject to an implied obligation of good faith and fair dealing.

Rorig correctly states the law on this point: Ohio public policy dictates that every contract contain an implied duty for the parties to act in good faith and to deal fairly with each other. *Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 463, 839 N.E.2d 49, 54 (Ohio App. 2005).

Once again, however, Turman is not a party to the Purchase Contracts.  Thus, the fifth count of the Complaint fails to state a claim against him.

### F.  RICO Violations

Rorig alleges that the Defendants transmitted in interstate commerce fraudulent misrepresentations contained in the Investment Brochure, Rent Roll and Recurring Charges Report, and the Vacancy Report for the purpose of obtaining money from her and that she has been injured by these fraudulent representations because she applied a down payment toward the purchase price of the Real Estate and incurred a debt obligation for the purpose of paying the balance of the purchase price.  Turman asserts that Rorig has failed to sufficiently state a RICO claim against him because she failed to plead with particularity the predicate acts substantiating the RICO claim as required by Civil Rule 9 when the alleged predicate acts sound in fraud.

To state a civil RICO claim, a complaint must allege that (1) the defendant (2) through the commission of two or more "predicate" acts, (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce, and (8) that the plaintiff was injured in his business or property as a result.  *Update Traffic Sys., Inc. v. Gould*, 857 F. Supp. 274, 280 (E.D.N.Y 1994).  The predicate acts Rorig alleges are violations of the "wire fraud" statute, 18 U.S.C. § 1343, the elements of which are (1) a scheme to defraud, and (2) use of an interstate electronic communication in furtherance of the scheme.  *Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass.*, 176 F.3d 315, 322 (6th Cir. 1999).

The United States Supreme Court established a two-part test to determine whether a RICO plaintiff has sufficiently alleged a pattern of racketeering activity.  *H.J. Inc. v.*

21

*Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989): "The term 'pattern' itself requires the showing of a relationship between the predicates, . . . and of 'the threat of continuing activity.'" The Sixth Circuit has delineated several factors for a court to consider in determining whether a pattern has been sufficiently pleaded:

> a pattern is the sum of various factors including: the length of time the racketeering activity existed; the number of different schemes (the more the better); the number of predicate acts within each scheme (the more the better); the variety of species of predicate acts (the more the better); the distinct types of injury (the more the better); the number of victims (the more the better); and the number of perpetrators (the less the better).

*Columbia Natural Resources, Inc. v. Tatum*, 58 F.3d 1101, 1110 (6th Cir. 1995).

Rorig's Complaint falls short of alleging a pattern of racketeering activity.  While she recites the basic elements of the claim, she does not allege threat of continuing activity.  Nor does she allege any relationship between the predicate acts of transmitting the "fraudulent representations contained in the Investment Brochure, Rent Roll and Recurring Charges Report, and the Vacancy Report" and any threat of continuing activity.  (Doc. 1 ¶64.)  She has therefore failed to sufficiently state a RICO claim against Turman, and his motion to dismiss Count Six of the Complaint is granted.

### G.  Conversion

A conversion is defined as "the wrongful assuming of unauthorized control over the personal property of another, whether it is done purposefully or not."  *Fulks v. Fulks,* 95 Ohio App. 515, 518, 121 N.E.2d 180, 182 (Ohio App. 1953).  Rorig states that the sales proceeds constituted her personal property and that she was wrongfully deprived of this personal property

as a result of Turman's fraudulent conduct.  (Doc. 18 at 12.)  Because the Court has determined that Turman did not act fraudulently, Rorig's conversion claim against him must fail.

### H.  Constructive Trust

A constructive trust is a remedy arising by operation of law against someone who "through any form of unconscionable conduct holds legal title to property where equity and good conscience demands that he should not hold such title."  *Dixon v. Smith*, 119 Ohio App. 2d 308, 695 N.E.2d 284 (Ohio App. 1997).  Rorig argues that Turman was paid a sales commission out of the sales proceeds and that this commission was improperly obtained by Turman through his wrongful conduct.  (Doc. 18 at 13.)  As the Court has determined that Turman's conduct was not wrongful, Rorig's claim urging imposition of a constructive trust against him must fail.

### I.  Punitive Damages and Attorney Fees

Having determined that each of Rorig's substantive counts against Turman fail either for failure to state a claim or because of her failure to demonstrate a triable issue of fact, she has no grounds for pursuit of either punitive damages or attorney fees against Turman.

## IV.  CONCLUSION

For the foregoing reasons, Defendant Stephen M. Turman's Motion to Dismiss (doc. 15) is **GRANTED** as to Counts Two, Three, Five, and Six; the Motion for Summary Judgment of Stephen M. Turman (doc. 44) is **GRANTED** as to the remaining counts; and Defendant Stephen M. Turman's Motion to Strike (doc. 59) is **DENIED**.

IT IS SO ORDERED.


      s/Susan J. Dlott
      Susan J. Dlott
      United States District Judge


24