IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **Carol Dawn Rorig**, | : | Case No. 1:05cv801 |
| | : | |
| Plaintiff, | : | District Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING |
| | : | DEFENDANTS' MOTION FOR |
| **Howard G. Thiemann, et al.**, | : | SUMMARY JUDGMENT |
| | : | |
| Defendants. | : | |

This matter comes before the Court on the Motion for Summary Judgment of Defendants Howard G. Thiemann, individually and as executor of the Estate of Charlotte Thiemann, Albert K. Zimmer, Virginia A. Zimmer, John. F. Wagner, Jr., Linda S. Wagner, Thiemann Realty, Inc., Jeff Thiemann on behalf of Thiemann Management company, The Fischer Group, and Vertis L. Dye (doc. 47); Plaintiff's Memorandum in Opposition thereto (doc. 55); and Defendants' Reply (doc. 61). For the reasons that follow, the Court **GRANTS** Defendants' Motion.

**I.     BACKGROUND**

This action arises from Plaintiff Carol Rorig's March 2005 purchase of two apartment buildings, collectively containing sixty-three units, located in Hamilton County, Ohio (hereafter "Real Estate") for $1,105,000. Defendants Howard Thiemann, Charlotte Thiemann,[1] Albert Zimmer, Virginia Zimmer, John Wagner, and Linda Wagner (hereafter "Owners") owned the Real Estate until they sold it to Rorig. Defendant Fisher Group is a partnership consisting of the

---

[1] Charlotte Thiemann died in March 2005, and the executor of her estate has been substituted as a party.

1

Owners organized to share the profits and expenses of the Real Estate. Defendant Vertis Dye was the Real Estate property manager for the Owners during the period of their ownership. Defendant Steve Thiemann, Howard Thiemann's son, is an owner of Defendant Thiemann Realtors, Inc. and was responsible for managing the Real Estate, which included the responsibility of collecting rents and obtaining tenants when the apartments became vacant.

In the fall of 2004, Howard Thiemann contacted Defendant real estate broker Stephen Turman and asked him to list the Real Estate for sale. In connection with his marketing of the Real Estate, Turman produced an investment brochure (hereafter "Investment Brochure"). (*See* doc. 65, proposed amended complaint, Ex. B.)[2] The Investment Brochure included a property summary, a property description, photographs of the Real Estate, a 2004/2005 proforma showing estimated income and expenses, and a rent roll. (*See* doc. 65 Ex. B.) Turman obtained information for the Investment Brochure from Thiemann Realtors and Vertis Dye. The 2004/2005 proforma included in the Investment Brochure indicated that the Real Estate had a ninety-four percent occupancy rate and an effective annual income of $265,280. (*Id.*) The proforma contained the following statement: "The statements and figures herein, while not guaranteed, are secured from sources we believe reliable." (*Id.*)

Rorig, who is a California resident, learned of the Real Estate through her fiancé, Anthony Simmons. Simmons used a commercial real estate website, Loopnet, to search for potential investment property. Through Loopnet, Simmons contacted Turman. Turman

---

[2] Rorig manually filed a copy of the Investment Brochure with her original complaint in December 2005, thus the Brochure is not available electronically as part of doc. 1. However, Rorig electronically filed a copy of the same Brochure in conjunction with filing her motion for leave to file an amended complaint, doc. 65, and the Court will direct the reader to that document when referring to the Investment Brochure.

provided the Real Estate Investment Brochure to Simmons, who then showed it to Rorig. The Investment Brochure contained a disclaimer, which provided in part: "No representations or warranties, express or implied, as to the accuracy of completeness of this investment brochure or any of its contents shall be deemed made, and no legal commitment or obligation shall arise by reason of this investment brochure or its contents." (*Id.*) Both Rorig and Simmons reviewed the disclaimer. (Defendants' Proposed Undisputed Facts, doc. 47 ¶¶ 22, 26; Rorig's Response, doc. 56 ¶¶ 22, 26.)

On February 15, 2006, Rorig entered into two purchase contracts (hereafter "Purchase Contracts") with the sellers for the Real Estate in the total amount of $1,105,000. Thereafter, Simmons performed due diligence on the property.[3] Simmons inspected the property and talked to tenants as part of his inspection. At Simmons' request, Turman provided Simmons with additional information, which he obtained from Thiemann Realtors, including 2002 and 2003 Form 8825 tax forms (doc. 65 Ex. F), the current tax bill, a legal description, a January "Rent Roll" (Turman Dep. Ex. 25), a January "Rent Roll & Recurring Charges" form (*id.* Ex. 26), and a copy of all the leases (*id.* Ex. 47).

The January 2005 Rent Roll & Recurring Charges form listed the tenants' names, the unit number, the number of bedrooms in the unit, the rent charge (abbreviated as RC), and a "total" for each unit. (Doc. 65 Ex. D.) The third and last page of the Rent Roll and Recurring Charges

---

[3] In her deposition, Rorig explained that Simmons "was the one that performed the due diligence, . . . that was his role within this." (Rorig Dep. 223.) Rorig also testified that she relied on Simmons' judgment as to what information he should ask for as part of the due diligence required: "Q. So, you relied upon Mr. Simmons' judgment in determining whether or not he should ask for and provide you the appropriate information including operating statements before you entered into this transaction; isn't that correct? A. Yes." (Rorig Dep. 223.)

3

form was a summary that stated a monthly "Total Income/Receipts" for fifty-eight customers[4] of $20,305. Around the same time, Turman also provided Simmons with Rent Roll & Recurring Charges forms for February and March. (*Id*.) Like the January form, the February Rent Roll & Recurring Charges form listed a Total Income/Receipts of $20,310 for fifty-eight customers. (*Id*.) The March Rent Roll & Recurring Charges form listed a Total Income/Receipts of $20,660 for fifty-nine customers. Annualized, the Total Income/Receipts reflected by the January, February, and March 2005 Rent Rolls would have been between $243,660 and $247,920.

In contrast, the 2002 tax form Turman provided to Simmons reflected total gross annual rents from the Real Estate of $204,189. (Doc. 65 Ex. F). The 2003 tax form reflected total gross annual rents of $191,578. (*Id*.) Simmons and the lender asked for clarification due to the apparent discrepancy between the 2005 rent rolls and the 2002/2003 tax forms.[5] Based on this request, Turman called Steve Thiemann and asked that he provide clarification. In response, Thiemann Realtors sent Simmons and Rorig a letter dated March 8, 2006, that stated:

> To Whom it May Concern:
>
> The current rental income numbers are higher than those in 2002 and 2003 in large part due to the higher number of vacancies at that time (2002 and 2003). However, currently we have a much more positive occupancy rating due, in part, to a better rental market and the redevelopment of some other apartment land, which brought those tenants to us and other investors in the area.

---

[4] Because there are sixty-three units and only fifty-eight customers, the form reflected five vacancies.

[5] According to Turman, the lender wanted to know "why 2002/2003 income numbers were different than what the property was doing in '04. . . . the rent rolls that I had received in '04 extrapolating those out to an annual number were much higher than the income they reported in their '02 and '03 tax returns." (Turman Dep. 422-23.)

(Doc. 65 Ex. G, hereafter "Affirmation Letter.") Simmons was familiar with Rent Manager, a computer program used by property management companies, including Thiemann. (Simmons Dep. 677.) He was aware that Rent Manager can generate actual deposit records and payment histories for each tenant. However, he did not request either deposit records or payment histories. (*Id*. 678-79.) Simmons did undertake a personal inspection of the Real Estate on January 20, 2005, at which time he walked through and inspected all sixty-three units and talked to a number of tenants. (*Id*. at 169-70; 179.)

On February 15, 2005, Rorig signed the Purchase Contracts for the Real Estate. The Contracts state, in part:

> 5. CONTINGENCIES: The Buyer's obligation to close this transaction is continent upon the following:
> \* \* \*
> (b) INSPECTIONS: This Purchase and Sale Agreement and the consummation of this transaction are contingent upon the Buyer making a determination of the feasability of the subject property for his intended purpose. In making that determination, Buyer shall undertake certain investigations and examinations of the property. Buyer shall have n/a days from a mutually executed contract to make any investigations and examinations which he feels are appropriate. Buyers examinations and investigations shall include, but not be limited to, the following:
> \* \* \*
> 2. Review all operating statements for the last two years and the current year-to-date, which statements shall reflect operating costs, rent schedules and collected income.
> \* \* \*
> 16. SOLE CONTRACT: The parties agree that this Contract constitutes their entire agreement, and that no oral or implied agreement exists. Any amendments to this agreement shall be made in writing, signed by both parties and copies shall be attached to all copies of this original agreement. This offer, when accepted, shall be binding upon the parties, their heirs, administrators, executors, successors and assigns.

(Doc. 65 Ex. C.) Rorig understood that, prior to signing the Agreements, she was entitled to review operating statements for the prior two years, but she did not ask for them. (Rorig Dep. 222.) Prior to purchasing and closing on the Real Estate, Rorig never had any conversations with Howard Thiemann, Charlotte Thiemann, Albert Zimmer, Virginia Zimmer, John Wagner, Linda Wagner, any representative from Thiemann Realtors, Vertis Dye, or The Fisher Group. (Rorig Dep. 186-187.)[6]

Simmons hired Don Smith as the first property manager under Rorig's ownership, and in the middle of March 2005, Smith put fliers under the tenants' doors notifying them of new management beginning April 1. (Smith Dep. 11.) April rent was due on the first of the month, but by April 7th-8th, Smith had received rent from less than ten percent of the tenants. (Smith Dep. 17.) He then went door-to-door to collect the rent, and the rent began "trickling in." (*Id*. at 18). None of the tenants told Smith that they had never paid rent or that they weren't expected to pay rent. (*Id*. at 19, 29.) However, Smith discovered that "the rents were paid haphazardly. They [the tenants] were used to paying $100 here, $100 there." (*Id*. at 112.) Seventeen tenants were eventually evicted for failure to pay April rent. (*Id*. at 25.)

Out of this scenario springs Rorig's nine-count complaint making the following claims against the Defendants: (1) fraud, (2) breach of contract based on fraud in the inducement, (3) breach of contract–implied conditions, (4) unjust enrichment, (5) breach of implied duty of good faith and fair dealing, (6) Racketeer Influenced and Corrupt Organizations Act ("RICO") claim

---

[6] Defendants made this same statement in their Proposed Undisputed Facts, doc. 47-3 ¶ 42, and Rorig denied it in her response, doc. 56 ¶42. Rorig's denial, based on her position that the proposed statement implies she did not interact with the Defendants through their agents, is unwarranted. The statement is true, as is demonstrated by Rorig's own deposition testimony.

6

based on wire fraud, (7) conversion, (8) constructive trust, and (9) punitive damages/attorney fees. (Doc. 1.) Although she sought rescission as a remedy at the time she filed the Complaint, Rorig no longer owns the Real Estate because the lender sold it at a foreclosure sale.

All the Defendants named in this lawsuit moved for summary judgment in their favor. The Court granted Defendant Turman's motion for summary judgment. (Doc. 75.) The Court now grants summary judgment in favor of the remaining Defendants.

## II.     Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The task of the Court is not "to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

### III. ANALYSIS

#### A. Fraud

In Count One of her Complaint, Rorig alleges that the Defendants represented that the Real Estate had a ninety-four percent occupancy rate and an effective annual income of $265,280; that the occupancy rate and effective annual income were material to the transaction; that the Defendants knowingly "stacked" the Real Estate to artificially inflate the occupancy rating or recklessly disregarded the validity of the occupancy rating; that they submitted information to her with the intent of misleading her; and that she justifiably relied upon the misrepresented occupancy rate and effective annual income to her detriment. (Doc. 1 ¶¶ 40-44.) Defendants argue that Rorig's fraud claim must fail because (1) they did not make any material false representations to her, (2) no evidence exists that they made any false statements with knowledge of said falsity, and (3) Rorig was not justified in relying on any material misrepresentations.

To prove a claim for common law fraud under Ohio law, a plaintiff must prove:

> (a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 352 (6th Cir. 2000) (citing *Burr v. Board of County Comm'rs of Stark Co.*, 23 Ohio St. 3d 69, 491 N.E.2d 1101, 1105 (1986)). Fraud is

8

never presumed but must be affirmatively proved. *Beneficial Fin. Co. v. Smith*, 15 Ohio App. 2d 208 (1st Dist. 1968).

Rorig has failed to demonstrate that there exists a triable issue that Defendants knowingly or recklessly made false representations to her concerning the Real Estate. The crux of Rorig's allegations against Defendants is that "they knew the rent rolls did not contain the necessary information for evaluating the rental income collected from the Property, yet actively engaged in misleading Rorig by continuing to supply rent rolls with misinformation which they knew Rorig was basing her decision to purchase the Property upon and then backing it up with the Affirmation Letter." (Doc. 55 at 9.) This allegation, even if true, cannot form the basis of a fraud claim against the Defendants. The information contained in the rent rolls was not demonstrably false, and Rorig does not so allege. Rather, her argument is that the rent rolls "had no correlation to whether a listed tenant ever paid rent." (*Id.*) That Rorig failed to understand the information contained within the rent rolls does not make them false.[7]

Neither is the information contained within the Affirmation Letter demonstrably false. The March 8, 2005 letter states that "the current rental income numbers are higher than those in 2002 and 2003. . . ." Although Rorig asserts that the rental income in April 2005, the first month

---

[7] Rorig cites *Cohen v. Lamko, Inc.*, 10 Ohio St. 3d 167 (Ohio 1984) for its affirmation of the trial court's finding that a defendant's overstatement of rental income produced by rental property was evidence of fraud. The facts of *Cohen* are distinguishable. In *Cohen*, the trial court concluded that the defendant made false and fraudulent representations in the following respects: (1) he falsely represented that there were no building orders against the property, (2) he falsely represented the percentage of the number of rented apartments; and (3) he falsely represented all that the building needed was ordinary maintenance. *Cohen v. Lamko, Inc.*, No. CA 7974, 1983 WL 4907, *2 (Ohio App. July 6, 1983). As discussed above, there is no evidence that Defendants falsely represented the number of rented apartments or anything else. Furthermore, there is no evidence in this case that Simmons or Rorig ever requested a list comprising amounts of rent actually paid, so there is no evidence that Defendants ever provided a false list.

of her ownership of the Real Estate, was $12,000 (Smith Dep. 138), she has not set forth any evidence demonstrating what the rental income was in the three months prior to that, nor has she presented evidence comparing monthly or quarterly rental income between the years 2002, 2003, and 2004.[8] Without such information, the Court cannot conclude that the "current rental income" as of March 8, 2005 was not higher than in 2002 and 2003.

Even if the "current rental income" was not, in fact, higher in March 2004 than in 2002 and 2003, Rorig has failed to demonstrate that Steve Thiemann, who was responsible for the letter, made the statement falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred. Thiemann's testimony was that he dictated the Affirmation Letter "from [his] memory, from what [he] believed to be true." (Thiemann Dep. 224.) While he likely would have been able to provide more detailed information in the letter had he referred to documents rather than relying on memory, the fact that he relied on his memory and "hands-on experience" (*id*. at 238) does not support a conclusion that he made the statement with knowledge of any falsity or reckless disregard as to any falsity.

Rorig also has failed to demonstrate that there exists a triable issue that she was justified in relying on the rent rolls or Affirmation Letter as demonstrating actual rental income. Under Ohio law, "a person is expected to conduct his or her dealings with proper vigilance." *Dito v. Wozniak*, 2005 WL 19437 (Ohio App., Jan. 5, 2005). To wit, "[o]nce aware of a possible

---

[8] Neither has Rorig presented any evidence that the effective annual income of the property at the time she purchased it was only $132,000 as she alleged in her Complaint. While a Delinquency Report Rorig obtained from the sellers through discovery reflects that there was a total delinquent amount of $14,385.09 as of the February 15, 2005 (doc. 55 ex. D), this does not lend to a conclusion concerning the effective annual income of the Real Estate.

problem, the buyer has a duty to either (1) make further inquiry of the owner, or (2) seek the advice of someone with sufficient knowledge to appraise the defect." *Id.*

Rorig was aware of a possible issue concerning the rental income of the Real Estate when she reviewed the prior two years' tax returns and saw that the Real Estate was reporting a loss. Despite this knowledge, she never expressly asked the Defendants for operating statements or any other information pertaining to rent delinquencies. Notwithstanding the fact that she delegated the task of performing due diligence to her fiancé, it was Rorig herself who entered into the Purchase Contracts, which expressly provides that the "Buyers examinations and investigations shall include, but not be limited to, the following: . . . 2. Review all operating statements for the last two years and the current year-to-date, which statements shall reflect operating costs, rent schedules and collected income." There is no evidence in the record that Rorig or Simmons ever asked Defendants for information pertaining to "collected income," much less that Defendants provided false information pertaining to the same.[9]

Because Rorig has failed to demonstrate that there is a triable issue of fact as to whether the Defendants knowingly or recklessly made false representations to her or that she justifiably

---

[9] Rorig claims in her opposition memorandum that she and her agents "requested information regarding rental income produced by the Property" but did not receive it. (Doc. 55 at 11.) Unfortunately, Rorig fails to cite anything in the record to support this claim, and the deposition transcripts contradict it. Specifically, the uncontroverted testimony was that either Simmons or Wells Fargo Bank put together a list of items that they wanted to review, which included copies of the leases, tax returns, the current real estate tax bill, a legal description, an environmental questionnaire, and rent rolls–all of which were provided to Simmons. (Turman Dep. 267-71.) There is simply no testimony or other evidence to demonstrate that Rorig or Simmons ever requested documentation of rental income, namely, an operating statement or spreadsheet reflecting rent receipts.

relied on any false representation, Defendants are entitled to summary judgment on Rorig's claim of fraud.

### B. Breach of Contract Based on Fraud

In Count Two of her Complaint, Rorig alleges that her "consent to enter into the Purchase Contracts was seduced by the lies and deliberate half-truths made and published by the Defendants" and that she is therefore "entitled to rescind the Purchase Contracts entered into with the Sellers." (Doc. 1 ¶ 48.) Because her second cause of action is grounded in her allegation of fraud, and because the Court has concluded that Rorig has not presented sufficient evidence to create a triable fact issue with respect to fraud, summary judgment in Defendants' favor is proper. Furthermore, the remedy of rescission is no longer a viable option in this case as the Real Estate has undergone a foreclosure and Rorig no longer owns it.

### C. Breach of Contract–Implied Condition

Rorig's third count asserts that she is entitled to her "loss of the bargain" that she expected when she entered into the Purchase Contracts. (Doc. 1 ¶ 52.) Specifically, she claims that an implied condition of the Purchase Contracts was that the tenants were paying rent and that fifty percent of them were not.

The integration clause contained within the Purchase Contracts, which provides that "[t]he parties agree that this Contract constitutes their entire agreement, and that no oral or implied agreement exists" (doc. 65 Ex. C), precludes Rorig from successfully arguing that there were any implied contractual conditions. Rorig makes no supported argument to the contrary in

her opposition memorandum.[10] Accordingly, summary judgment in Defendants' favor on this claim is granted.

### D. Unjust Enrichment

In her fourth count, Rorig states that because approximately half the tenants were paying rent, the fair value of the Real Estate was half of the purchase price, thus to permit the Defendants to retain the economic benefit conferred on them would constitute an unjust enrichment. (Doc. 1 ¶¶ 54, 56.) Defendants summarily rely on the other arguments made in their motion as a basis for contesting the viability of Rorig's unjust enrichment claim. (Doc. 47 at 26.)

Three elements comprise an unjust enrichment claim under Ohio law: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Hambelton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 183, 465 N.E.2d 1298 (Ohio 1984). Rorig's unjust enrichment claim fails for at least two reasons. First, as Rorig herself states, the crux of her unjust enrichment claim is that Defendants "perpetrated a fraud upon her through misrepresentations overstating the amount of rental income produced by the Property." (Doc. 55 at 15-16.) Rorig has not put forth any evidence that Defendants perpetrated a fraud upon her.

---

[10] Rorig summarily states that the integration clause does "not provide blanket immunity" and does not shield the Defendants from liability for their fraudulent conduct. (Doc. 55 at 10-11.) Again, as Rorig has failed to demonstrate the existence of a fact issue concerning whether the Defendants engaged in fraudulent conduct, her reliance on any fraud exception to contract interpretation must also fail.

Additionally, Rorig has not come forth with any evidence tending to demonstrate the fair market value of the Real Estate.  Without evidence of the market value of the Real Estate, there is no way for the Court to determine whether the amount Rorig paid to the Defendants unjustly enriched them.  Rorig's citation to delinquency reports listing rent delinquencies in January, February, and March 2005 ranging from $12,123 to $14,963 demonstrates only that certain tenants were delinquent in their rent.   Rorig does not give the Court the benefit of any analysis or expert opinion tending to link any such delinquency to the fair market value of the Real Estate.  Because Rorig has failed to put forth evidence to demonstrate a triable fact issue as to whether Defendants' retention of the sales proceeds would be unjust, Defendants are entitled to summary judgment on Rorig's claim of unjust enrichment.

### E.  Breach of Implied Duty of Good Faith and Fair Dealing

Rorig's fifth count asserts that "[u]nder Ohio law, every contract burdens the parties with the obligation to act and deal with one another in good faith" and that "[b]y knowingly misrepresenting that the Tenants were paying rent and were doing so on a consistent and timely basis, the Defendants have breached their duty of good faith, entitling Rorig to rescind the Purchase Contracts. . . ."  (Doc. 1 ¶¶ 59-60.)  Defendants respond that the duty of good faith and fair dealing does not create an independent cause of action on behalf of the Plaintiff against the Defendants.

Rorig is correct to the extent that Ohio public policy dictates that every contract contain an implied duty for the parties to act in good faith and to deal fairly with each other.  *Littlejohn v. Parrish*, 163 Ohio App. 3d 456, 463, 839 N.E.2d 49, 54 (Ohio App. 2005).  However, Defendants are correct that this duty of good faith "does not authorize an independent cause of

action." *Cook v. Home Depot U.S.A., Inc.*, No. 2:06cv571, 2007 WL 710220 at *4 (S.D. Ohio, March 6, 2007) (citing *Physicians Weight Loss Ctrs. v. Creighton*, No. 90cv2066 (N.D. Ohio, March 30, 1992.)  Rather, the duty "serves as a 'salutary rule of construction' in evaluating contractual performance.'" *Id.* (citing *Bolling v. Clevepak Corp.*, 484 N.E.2d 1367, 1376 (Ohio Ct. App. 1984)).  "This understanding of the good faith requirement comports with the statutory language, which refers to 'an obligation of good faith in . . . *performance* or *enforcement* [of contracts].'" *Id.* (citing Ohio Rev. Code § 1301.09).  In other words, "'a duty of good faith *originates* from a contractual relationship,' so the duty 'cannot exist until the underlying contract is formed.'" *Id.* at *5 (quoting *Walker v. Dominion Homes, Inc.*, N.E.2d 570, 580 (Ohio Ct. App. 2005)).

Rorig's claim is that Defendants made misrepresentations to her *prior to the execution of the contract*.  She does not allege that Defendants failed to perform under the contract.  Because the duty of good faith and fair dealing pertains to the performance of a contract, not the actions leading up to the contract's execution, Rorig has failed to state a claim for breach of duty of good faith and fair dealing against Defendants.

**F.  RICO Violations**

Rorig alleges that Defendants violated RICO, set forth in 18 U.S.C. §1961, et seq., when they transmitted in interstate commerce fraudulent misrepresentations contained in the Investment Brochure, Rent Roll and Recurring Charges Report, and the Vacancy Report. Defendants assert that they are entitled to summary judgment on the RICO claim because Rorig has failed to sufficiently show a predicate act of wire fraud or any pattern of racketeering activity.

To state a civil RICO claim, a complaint must allege that (1) the defendant (2) through the commission of two or more "predicate" acts, (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate or foreign commerce, and (8) that the plaintiff was injured in his business or property as a result. *Update Traffic Sys., Inc. v. Gould*, 857 F. Supp. 274, 280 (E.D.N.Y 1994).  The predicate acts Rorig alleges are violations of the "wire fraud" statute, 18 U.S.C. § 1343, the elements of which are (1) a scheme to defraud, and (2) use of an interstate electronic communication in furtherance of the scheme. *Advocacy Org. for Patients and Providers v. Auto Club Ins. Ass.*, 176 F.3d 315, 322 (6th Cir. 1999).

The United States Supreme Court has held that to prove a pattern of racketeering activity, a plaintiff must show two elements: a "relationship between the predicates," or relatedness, and "the threat of continuing activity," or continuity. *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). To establish relatedness, the plaintiff must show that there are multiple criminal acts with the same or similar purposes, results, participants, victims, or methods of commission; or which are otherwise interrelated by distinguishing characteristics. *Id*. at 240.  To establish continuity, a plaintiff must demonstrate either "a closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." *Id*. at 241.  These concepts may be referred to as "closed-ended" and "open-ended" continuity. *Id*.

Rorig has failed to demonstrate a triable issue of fact concerning either of the two elements required to demonstrate a pattern of racketeering activity.  As to relatedness, Rorig has failed to show that Defendants engaged in multiple criminal acts with the same or similar purpose.  The predicate acts of which she complains are the transmission by Defendants to Rorig

16

of rent rolls over a three-month period misrepresenting the amount of rental income produced by the Real Estate. However, Rorig has not presented evidence that the rent rolls were, in fact, misleading or that they were used in furtherance of a scheme to defraud. By failing to offer evidence to support her allegation of fraud, Rorig has not satisfied her burden of demonstrating the relatedness element of racketeering activity.

      Nor has Rorig established continuity. Her assertion that Defendants provided her with misleading information over a three-month period is insufficient to demonstrate closed-ended continuity, which requires "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 241; see also *Monarch Normandy Square Partners v. Normandy Square Assoc. Ltd. P'ship*, 817 F. Supp. 908, 914 (D. Kan. 1993) (holding that plaintiffs failed to meet the standard of closed-ended continuity when the alleged predicate acts of defendant real estate sellers did not extend beyond one year). Neither does Rorig put forth evidence to demonstrate open-ended continuity, which requires a clear threat of future criminal conduct related to past criminal conduct. *Id.* Although she alleges that "there is a threat that such conduct [the misrepresentation of rental income by means of rent rolls] will continue in the future," she has offered no evidence of any past criminal conduct nor any clear threat of criminal conduct in the future. Her evidence that Turman does business with Howard Thiemann's brokerage and appraisal companies and that Steve Thiemann's practice for disseminating information about rental receipts and occupancy is through rent rolls is insufficient to demonstrate a fact issue as to whether there is a "clear threat of future criminal conduct" on the part of the Defendants. The Court thus concludes that Rorig cannot establish a pattern of racketeering activity and, accordingly, her RICO claim must fail.

### G. Conversion

In her seventh count, Rorig claims that she bargained to purchase the Real Estate on the basis that it possessed a high occupancy rate with paying tenants, that she did not receive the benefit of the bargain due to Defendants wrongful actions, and that Defendants' retention and use of the sales proceeds constitutes a conversion of Rorig's personal property. (Doc. 1 ¶¶ 72-78.) Defendants argue that Rorig's conversion claim fails because she has presented no evidence to support the assertion that they have willfully exercised dominion and control over funds belonging to Rorig. (Doc. 47 at 30.)

A conversion is defined as "the wrongful assuming of unauthorized control over the personal property of another, whether it is done purposefully or not." *Fulks v. Fulks,* 95 Ohio App. 515, 518, 121 N.E.2d 180, 182 (Ohio App. 1953). Under Ohio law, the elements of a conversion claim are: (1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages. *NPF IV, Inc. v. Transitional Health Serv.*, 922 F. Supp. 77, 81 (S.D. Ohio 1996) (citing *Haul Transport of VA, Inc. v. Morgan*, No. CA 14859, Montgomery Cty., 1995 WL 328995 (Ohio App. 1995)). Money can be the subject of an action for conversion. *Id.* However, "an action for conversion of money will not lie unless identification is possible and there is an obligation to deliver the specific money in question." *Id.* (citing cases).

Rorig does not cite a single case to support her position that the facts she alleges create a cause of action for conversion under Ohio law. Rather, she makes the bare assertion that "[t]o the extent the Property did not produce rental income in the amount represented by the Defendant-Sellers and their agents, she did not receive the 'value' bargained for. Accordingly,

18

she has been wrongfully deprived of her personal property." (Doc. 55 at 18.) The Court can find no case law that demonstrates a precedent for allowing a conversion claim to proceed based on such allegations. The facts demonstrate that Rorig voluntarily entered into two Purchase Contracts with the Defendants concerning the Real Estate and that the Defendants performed their obligation under the Purchase Contracts by giving Rorig title to the Real Estate. Nothing in the Purchase Contracts specified the amount of rental income the Real Estate would generate, thus specific rental income was not a component of the contractual agreement. Rorig has not provided the Court with any information that might be used to demonstrate the "value" of the Real Estate or determine how rental income factors into a property valuation equation, thus there is no evidence that she did not receive precisely the value she bargained for. Finally, even if there were precedent under Ohio law for a claim of conversion under the circumstances alleged, Rorig has not presented any facts to demonstrate that she could satisfy the second element of the claim: a wrongful act on the part of the Defendants. Accordingly, Defendants are entitled to summary judgment on Rorig's conversion claim.

### H. Constructive Trust

In her eighth count, Rorig claims that she is entitled to the imposition of a constructive trust on the Sales Proceeds because they were improperly obtained by the Defendants. Defendants argue that because they have not committed any wrongful act, no claim for a constructive trust exists. A constructive trust is a remedy arising by operation of law against someone who "through any form of unconscionable conduct holds legal title to property where equity and good conscience demands that he should not hold such title." *Dixon v. Smith*, 119 Ohio App. 2d 308, 695 N.E.2d 284 (Ohio App. 1997). As the Court has determined that the

Defendants' conduct was not wrongful, Rorig's claim urging imposition of a constructive trust against them must fail.

### I. Punitive Damages and Attorney Fees

Having determined that each of Rorig's substantive counts against the Defendants fail because of her failure to demonstrate a triable issue of fact, she has no grounds for pursuit of either punitive damages or attorney fees against the Defendants.

### IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (doc. 47) is **GRANTED**.

       IT IS SO ORDERED.

                                                            s/Susan J. Dlott
                                                            Susan J. Dlott
                                                            United States District Judge